COPY

1    GOLD BENNETT CERA & SIDENER LLP
2    Solomon B. Cera (SBN 99467)
     Thomas C. Bright (SBN 169713)
3    595 Market Street, Suite 2300
4    San Francisco, California 94105
     Telephone: (415) 777-2230
5    Facsimile: (415) 777-5189
     scera@gbcslaw.com
6    tbright@gbcslaw.com
7
8    -and-
9    THE ROSEN LAW FIRM, P.A.
     Laurence M. Rosen (SBN 219683)
10   355 South Grand Avenue, Suite 2450
11   Los Angeles, CA 90071
     Telephone: (213) 785-2610
12   Facsimile: (213) 226-4684
13   Email: lrosen@rosenlegal.com
14
     Attorneys for Lead Plaintiffs
15   and all Others Similarly Situated
16              UNITED STATES DISTRICT COURT
17           CENTRAL DISTRICT OF CALIFORNIA
18   
     IN RE CHINA INTELLIGENT           Case No.: 2:11-cv-02768-PSG (SSx)
19   LIGHTING AND ELECTRONICS, INC.
     SECURITIES LITIGATION             CLASS ACTION
20
21   THIS DOCUMENT RELATES TO:         FIRST AMENDED
     ALL ACTIONS                       CONSOLIDATED CLASS ACTION
22                                     COMPLAINT FOR VIOLATION
                                       OF THE SECURITIES LAWS
23
24                                     JURY TRIAL DEMANDED
25
26
27
28

First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws

**TABLE OF CONTENTS**

**Page**

I.      SUMMARY OF THE ACTION ........................................................................ 2

II.     JURISDICTION AND VENUE .................................................................... 7

III.    PARTIES ........................................................................................................ 7

        A.      Lead Plaintiffs ............................................................................... 7

        B.      Issuer Defendant ........................................................................... 8

        C.      CIL Individual Defendants ........................................................... 9

        D.      Underwriter Defendants .............................................................. 10

        E.      Accounting Defendants ............................................................... 14

IV.     CLASS ACTION ALLEGATIONS ............................................................ 15

V.      THE GENESIS OF CIL ............................................................................. 17

VI.     CIL PUBLIC OFFERINGS AND SALE OF COMMON STOCK .................................. 200

VII.    FALSE STATEMENTS IN THE REGISTRATION STATEMENTS AND
        PROSPECTUSES ....................................................................................... 233

VIII.   THE TRUTH IS REVEALED .................................................................... 40

IX.     THE UNDERWRITERS WERE NEGLIGENT.......................................... 488

X.      ACCOUNTING DEFENDANTS' NEGLIGENCE ..................................... 533

XI.     PROOF OF RELIANCE IS UNNECESSARY........................................... 588

XII.    FIRST CLAIM............................................................................................ 588

Violation of Section 11 of the Securities Act Against all Defendants Except Rappaport, Rubin and Borer

XIII.   SECOND CLAIM........................................................................................ 611

Violation of §12(a)(2) of the Securities Act Against Rodman & Renshaw and WestPark

XIV.    THIRD CLAIM............................................................................................ 643

Violations of Section 15 of the Securities Act Against the Individual Defendants

JURY TRIAL DEMANDED ...................................................................................... 666

First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws

Pursuant to the Court's February 16, 2012 Order, Lead Plaintiffs Perritt Emerging Opportunities Fund, Acerco SA, and Antoine de Sejournet, (collectively "Lead Plaintiffs") through their attorneys, bring this action on behalf of themselves and all others similarly situated, and allege as follows.  The allegations herein are based on personal knowledge as to the Lead Plaintiffs as to their own acts, and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the investigation of Lead Plaintiffs' counsel.  This investigation has included a review of: (1) China Intelligent Lighting and Electronic, Inc.'s ("CIL" or the "Company") public filings with the Securities and Exchange Commission ("SEC"); (2) public announcements made by CIL; (3) wire and press releases published by and regarding the Company; (4) securities analysts' reports and advisories about the Company; (5) transcripts of quarterly earnings calls with CIL management; (6) CIL public filings with the State Administration of Industry and Commerce of the People's Republic of China ("SAIC")[1]; (7) information obtained from Chinese sources; (8) articles in the general and financial press; (9) information and opinions from an experienced certified public accounting firm based in the PRC.

---

[1] The SAIC is primarily responsible for business registration, business licenses, and acts as the government supervisor of corporations in the People's Republic of China.  The SAIC is the Chinese government registrar for official documents such as articles of incorporation, legal persons, registered capital and company ownership.  In order to renew their annual business licenses, all Chinese companies must file a "Company Annual Inspection Report" with the SAIC between March and June every year.  This report includes financial statements such as a balance sheet and an income statement, but those numbers are not verified or audited by the SAIC.

The investigation of Lead Plaintiffs' counsel into the factual allegations contained herein is continuing. Many of the relevant facts are known only by the Defendants, or are exclusively within their control or custody. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.

## SUMMARY OF THE ACTION

1.     This action is brought pursuant to the Securities Act of 1933, 15 U.S.C. §77k *et seq.* (the "Securities Act") by the Lead Plaintiffs on their own behalf and as a class action on behalf of all persons or entities who purchased or otherwise acquired CIL securities pursuant to or traceable to two (2) separate Registration Statements and three (3) accompanying Prospectuses filed with the SEC by CIL (the "Class"). The Registration Statement for an initial public offering ("IPO") of CIL common stock was declared effective by the SEC on June 17, 2010 (No. 333-164925) ("IPO Registration Statement") and was accompanied by a Prospectus filed with the SEC on June 21, 2010 ( "IPO Prospectus") (collectively the "IPO Offering Documents"). Also related to this Registration Statement was a Resale Prospectus filed with the SEC on July 27, 2010 ("Initial Resale Prospectus").

2.     An additional Registration Statement was declared effective by the SEC on December 15, 2010 (No. 333-170943) ("Secondary Registration Statement"), and was accompanied by a Prospectus filed with the SEC on

December 15, 2010 ("Secondary Prospectus") (collectively the "Secondary Offering Documents").  The Registration Statement declared effective by the SEC on June 17, 2010 (No. 333-164925) and the Registration Statement filed with the SEC on December 13, 2010 (No. 333-170943) are collectively referred to as the "Registration Statements."

3.    All persons and entities who purchased or otherwise acquired CIL common stock from June 18, 2010 through March 24, 2011 (the "Class Period") can trace their shares to one of the Registration Statements.

4.    CIL has not issued an earnings statement covering a period of at least twelve (12) months beginning after the effective date of the IPO Registration Statement.

5.    Pursuant to the IPO Registration Statement, the Company offered 3,350,000 shares of CIL common stock at $3.00 per share for total gross proceeds of $10.05 million.  The Initial Resale Prospectus related to the resale of up to 1,377,955 shares of CIL common stock by certain selling shareholders.  The Secondary Resale Registration Statement related to the resale of up to 1,858,323 shares of CIL common stock by certain selling shareholders.

6.    As set forth below, the IPO Offering Documents, the Initial Resale Prospectus and the Secondary Offering Documents (collectively, the "Offering Documents" ) contained material misstatements and omitted material information in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C.

§§ 77k, 77l(a)(2) and 77o.  Defendants are liable for material misstatements and omissions in these documents under the Securities Act.

7.     Lead Plaintiffs seek redress against Defendant CIL, which is responsible for the preparation and filing of the Offering Documents; Defendants Li Xuemei, Kui Jiang, Wu Shiliang, Michael Askew, Su Yang, Zhang Hongfeng, (collectively, the "Individual CIL Defendants") who signed the Registration Statements; Defendants WestPark Capital , Inc. and Rodman & Renshaw LLC which served as underwriters of the Offerings (collectively the "Underwriters"); Richard Rappaport who was the CEO, sole owner and hence control person of WestPark, and MaloneBailey LLP and Kempisty & Co. (collectively the "Auditors") who provided unqualified audit opinions on CIL's financial statements which were contained in the Offering Documents.

8.     This action arises from CIL's and the Individual Defendants' materially false statements in the Offering Documents.  The false statements were the issuer's (CIL's) false financial statements.  These statements were false for, among others, the following reasons:

a.     The financial statements in the Registration Statements report amounts for revenue and income that are contradicted by financial statements filed by CIL's sole operating subsidiary -- its only source of income -- with the SAIC showing materially smaller amounts of revenue and income;

b.      CIL's financial statements in the registration statement reported revenue of $59.2 million in 2009 and $42.9 million in 2008, while at the same time, its SAIC financial statements reported revenue of $13.5 million in 2009 and $14.8 million in 2008;

c.      CIL has only a single operating subsidiary in which all of its revenue was generated. Therefore, the underlying financial data on which CIL's revenue as reported in the Registration Statements is the same financial data relied on to support the revenue reported in its SAIC financial statements;

d.      Generally accepted accounting principles ("GAAP") for recognizing and reporting revenue for CIL are generally the same in the United States and China.

e.      Lead Plaintiffs have retained a China-based auditing firm expert in applying both Chinese GAAP and US GAAP to Chinese companies to analyze the relevant CIL financial statements herein at issue.  The Chinese auditing firm confirmed that differences between US GAAP and Chinese GAAP do not explain the much larger amounts of revenue, gross profit and net income reported in CIL's Registration Statements as compared to the same metrics as reported in its SAIC filings.  The expert analysis concluded that the revenue reported by CIL in its Registration Statements should have been the same as the revenue it reported in its SAIC financial statements;

f.      In the course of performing its audit for the year ended December 31, 2010, Defendant MaloneBailey resigned as CIL's registered independent accountant, withdrew its audit opinions for CIL's financial statements as of December 31, 2009, included in the IPO Registration Statement,

g.      MaloneBailey stated that it withdrew its audit opinion because CIL's financial statements have been falsified, that CIL had forged accounting records and bank statements, and that this constituted an illegal act;

h.      CIL acknowledged defendant MaloneBailey's resignation, and announced it had formed a committee to investigate the allegations of accounting fraud.  A year later, CIL has still not disclosed the results of the investigation;

i.      NYSE Amex LLC (the exchange on which the issuer's shares were publicly traded) has stated that CIL's financial statements may have been materially false, and that CIL's reaction to the charges that its statements were false cast substantial doubt on the integrity of the financial statements;

j.      In proceedings instituted against CIL on June 10, 2010, the SEC's Division of Enforcement alleged that CIL's independent auditor resigned on March 24, 2011, due to accounting fraud at the company involving forged accounting records and bank statements and that, as a result, CIL's registration statements are materially misleading and deficient; and

k.    The SEC, in an adjudicatory order, suspended the effectiveness
of the Registration Statements because it determined that CIL's financial statements
included an untrue statement of material fact.

## II.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 11,
12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

10.    This Court has jurisdiction over the subject matter of this action
pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v.

11.    Venue is proper in this Judicial District pursuant to § 1391(b), and
Section 22 of the Securities Act, 15 U.S.C. §77v.

12.    In connection with the acts, conduct and other wrongs alleged in this
Complaint, the Defendants, directly or indirectly, used the means and
instrumentalities of interstate commerce, including but not limited to, the United
States mails, interstate telephone communications and the facilities of the NYSE
Amex LLC.

## III.

## PARTIES

### A.    Lead Plaintiffs

13.    Lead Plaintiff Perritt Emerging Opportunities Fund ("Perritt") is a no
load mutual fund.  On June 18, 2010, Perritt purchased 300,000 CIL shares directly

from WestPark Capital Inc. in the IPO pursuant and traceable to the IPO

Registration Statement.  Perritt has been damaged as a result of its purchase of CIL

securities as reflected in its certification attached hereto.

14.    On June 18, 2010, Acerco SA ("Acerco") purchased 75,000 CIL

shares directly from Rodman & Renshaw LLC in the IPO pursuant and traceable to

the IPO Registration Statement.  Acerco has been damaged as a result of its

purchase of CIL securities as reflected in its amended certification attached hereto.

15.    On June 18, 2010, Lead Plaintiff Antoine de Sejournet purchased

25,000 CIL shares directly from Rodman & Renshaw LLC in the IPO pursuant and

traceable to the IPO Registration Statement.  Mr. de Sejournet has been damaged as

a result of his purchase of CIL securities as reflected in his amended certification

attached hereto.

## B.    **Issuer Defendant**

16.    Defendant CIL is a Delaware corporation with its principal executive

offices in Guangdong Province, People's Republic of China ("PRC").  CIL owns a

subsidiary that purports to manufacture LED lighting products in China.  Defendant

CIL was incorporated as a shell company, and acquired its Chinese operating

subsidiary via a reverse merger -- that is, it acquired the operating subsidiary and as

consideration for the acquisition gave to the subsidiary a controlling position in

itself. The corporate structure of the CIL is illustrated as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



17.     Hyundai Light & Electric (HZ) Co., Ltd ("Hyundai HZ") is CIL's only operating company.    All of CIL's revenues are generated from the sales of lighting and electronic equipment by Hyundai HZ.

18.     Hyundai HZ is a wholly owned foreign entity under Chinese law.  This means that Hyundai HZ is required to file audited financial statements.

19.     CIL's other subsidiary, Korea Hyundai Light & Electric (International) Holding Limited (Hong Kong) ("Korea Holding") is a holding company registered in Hong Kong.  Korea Holding has no manufacturing or sales operations.  It does not generate revenues and has no operating profit or tax liabilities.

**C.      CIL Individual Defendants**

20.     Defendant Li Xuemei ("Xuemei") was CIL's Chief Executive Officer, President, and Chairman of its Board of Directors, for the entire Class Period. Defendant Xuemei signed the Registration Statements.  Xumei owned 38.5% of CIL's outstanding voting stock at the time of the IPO.

21.    Defendant Kui Jiang ("Jiang") was the Company's Chief Financial Officer and Corporate Secretary for the entire Class Period.  Jiang signed the Registration Statements.

22.    Defendant Wu Shiliang ("Shiliang") was the Company's Executive Vice President and a Director of the Company for the entire Class Period.  Shiliang signed the Registration Statements.

23.    Defendant Michael Askew ("Askew") was a Director of the Company for the entire Class Period.  Defendant Askew resigned his position on or about March 24, 2011.  Askew signed the Registration Statements.

24.    Defendant Su Yang ("Yang") was a Director of the Company until she resigned on March 1, 2011.  Yang signed the Registration Statements.

25.    Defendant Zhang Hongfeng ("Hongfeng") was a Director of the Company for the entire Class Period.  Defendant Hongfeng signed the Registration Statements.

26.    Collectively, CIL and the Individual CIL Defendants are referred to herein as the "CIL Defendants".

**D.    Underwriter Defendants**

27.    Defendant WestPark Capital, Inc. ("WestPark") is an investment bank. WestPark's headquarters are located at 1900 Avenue of the Stars, Suite 310, Los Angeles, CA 90067.  WestPark was an underwriter of CIL's IPO.  WestPark styles itself as an innovative investment bank.

28.     Its primary contribution to finance is a transaction structure it has developed whereby a closely-held company such as CIL becomes a publicly held company traded directly on a national stock exchange through merger with a shell company and subsequent initial public offering.  In exchange, WestPark receives substantial cash payments and a large equity stake in the resulting company.  WestPark has trademarked the name for the process -- WRASP(tm).

29.     WestPark has taken five companies through the WRASP process -- CIL, China Electric Motors, Inc, NIVS InteliMedia Technology Group, Inc., China Century Dragon Media, Inc., and ZST Digital Networks, Inc.  All five have had their auditor resign and accuse the companies of accounting fraud.  All but ZST Digital Networks, Inc, have had trading in their shares halted by the SEC or the exchange on which they trade, and have ultimately been removed from their exchange.

30.     WestPark registered for sale 1,222,327 of its own CIL shares in the December 15, 2010 registration statement.

31.     Defendant Richard A. Rappaport is WestPark's founder and Chief Executive Officer.  He is the sole owner of the membership interests in the parent of WestPark Capital Financial Services, LLC ("WestPark Financial").

32.     According to WestPark's detailed report filed with the Financial Institution Regulatory Authority ("FINRA"), Rappaport controls the management or policies of WestPark, through his ownership of WestPark Financial.

33.     In layman's terms, Rappaport is the sole owner of WestPark, and thereby exerts complete control over WestPark.

34.     At all relevant times WestPark was a small investment bank with less than 50 employees. Rappaport exerted day-to-day control over all of its investment banking operations.

35.     Rappaport was a control person of WestPark under Section 15 stems based on his sole ownership of and control over WestPark and is legally responsible for WestPark's primary violations of Sections 11 and 12(a)(2) of the Securities Act arising from its roles as the underwriter for the Offering and the false and misleading Registration Statement and Prospectus.

36.     Prior to the Company's acquisition of its Chinese subsidiary, Rappaport was CIL's President and one of its directors.  Rappaport was also a substantial shareholder of CIL at the time of the underwriting, owning 1,774,435[2] shares directly and 1,472,346 through WestPark Capital Financial Services, respectively, 16.8% and 14.0% of CIL's pre-Offering shares. Rappaport registered for sale 193,333 CIL shares in the Secondary Registration Statement.

37.     Rappaport had complete control over the day to day operations and policies and procedures of WestPark. He also had control over WestPark's conduct and role in underwriting CIL's Offering.

_____

[2] All share counts have been adjusted to take into account a 2 for 1 reverse stock split.

38.     Because WestPark's substantial financial stake in the Offering created

a conflict of interest, FINRA ordered WestPark to obtain a second underwriter for

the Offerings.

39.     Defendant Rodman & Renshaw LLC ("Rodman & Renshaw") is an

investment bank.  Rodman & Renshaw maintains offices in New York, New York.

Rodman was the second underwriter of the Offerings.

40.     Defendant John Borer was Senior Managing Director and Head of

Investment Banking at Rodman & Renshaw. As Head of Investment Banking,

Borer had day-to-day oversight and responsibility for investment banking

transactions such as the IPO of CIL. Borer was directly involved in structuring and

effecting CIL's IPO.  Defendant Borer was intricately involved in the preparation of

the Registration Statements and Prospectus for CIL made effective on June 17,

2010. On June 15, 2010, Defendant Borer sent a letter to the SEC urging the SEC to

accelerate the effective date of CIL's Registration Statement.  Borer's control over

Rodman is further evidenced by his ownership of 6.9% of its outstanding voting

stock at the time of the IPO.

41.     Defendant Edward Rubin is Rodman & Renshaw's Chief Executive

Officer, President and Director and as such, had the power to direct or cause

direction of the management and policies of Rodman & Renshaw.  He also had day-

to-day responsibility over Rodman & Renshaw's operations.  Rubin's control over

Rodman is further evidenced by his ownership of 36% of its outstanding voting stock at the time of the IPO.

42.    Collectively, WestPark and Rodman & Renshaw are referred to herein as the "Underwriter Defendants."

**E.    <u>Accounting Defendants</u>**

43.    Defendant MaloneBailey LLP ("MaloneBailey") was CIL's registered independent auditor for the Class Period.  MaloneBailey provided an audit opinion on CIL's financial statements for Fiscal Year ended December 31, 2009, which was incorporated into every Prospectus and Registration Statement identified in this Complaint.

44.    Defendant Kempisty & Company, P.C. ("Kempisty"), is a professional accounting corporation with offices in New York, New York.  It provided an audit opinion on the financial statements of China Intelligent BVI (the holding company that holds CIL's Chinese operating subsidiary) for Fiscal Year ended December 31, 2008, incorporated into every Prospectus and Registration Statement identified in this Complaint.

45.    MaloneBailey and Kempisty are collectively referred to as, the "Accounting Defendants."

# IV.

# CLASS ACTION ALLEGATIONS

46.    Lead Plaintiffs bring this action as a class action pursuant to Federal

Rules of Civil Procedure 23(a) and 23(b)(3) on their own behalf and on behalf of a

Class consisting of all persons and entities who purchased or otherwise acquired

CIL common stock pursuant or traceable to the Registration Statements from June

18, 2010 to March 24, 2011, inclusive (the "Class Period"), and who were damaged

thereby.

47.    Excluded from the Class are the Defendants, officers and directors of

CIL at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns, and any entity in which an excluded

person has or had a controlling interest.

48.    The members of the Class are so numerous that joinder of all members

is impracticable.  Throughout the Class Period, CIL common stock was  traded on

the NYSE Amex LLC under the symbol "CIL."  While the exact number of Class

members is unknown to Lead Plaintiffs at this time and can only be ascertained

through appropriate discovery, Lead Plaintiffs believe that there are thousands of

members in the proposed Class who are geographically dispersed.  Members of the

Class can be identified from records maintained by CIL or its transfer agent and can

be notified of the pendency of this action by mail and through the Internet, using a

form of notice similar to that customarily used in securities class action lawsuits.

49.   Lead Plaintiffs' claims are typical of the claims of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws as alleged herein.  Lead Plaintiffs, like all members of the Class, purchased and/or acquired common stock of CIL during the Class Period and have sustained damages arising out of Defendants' wrongful conduct as alleged herein.

50.   Plaintiffs will zealously prosecute the claims and will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in securities litigation and class actions.  Lead Plaintiffs do not have any interests antagonistic to or in conflict with the other members of the Class.

51.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. Among the questions of law and fact common to the Class are the following:

a.   Whether the Defendants violated the Securities Act;

b.   Whether the Registration Statements and Prospectuses issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the business, operations, performance, and/or financial condition of CIL;

c.   Whether Lead Plaintiffs and other members of the Class have sustained damages and, if so, the proper measure of such damages.

52.     A class action is superior to all other available methods for the fair and

efficient adjudication of this controversy since joinder of all Class members is

impracticable.  Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs complained

of herein.  There will be no difficulty in the management of this action as a class

action.

## V.

## THE GENESIS OF CIL

53.     CIL was incorporated in Delaware on October 11, 2007, as SRKP 22,

Inc.  CIL was originally organized as a "blank check" shell company to investigate

and acquire a target company or business seeking the perceived advantages of being

a publicly held corporation.

54.     Korea Holding was incorporated under the laws of Hong Kong, PRC

on April 27, 2005 by its original sole shareholder Mr. Li.  On July 17, 2008, Mr. Li

transferred 100% ownership in Korea Holding to CIL.  Korea Holding became a

subsidiary of CIL thereafter.  Korea Holding does not conduct any manufacturing,

sales or other business operations.

55.     Hyundai Light & Electric (HZ) Co., Ltd. ("Hyundai HZ") is located at

Huizhou, Guangdong Province, PRC and was incorporated under Chinese law on

July 6, 2005.  Prior to July 17, 2008, Hyundai HZ was the wholly owned subsidiary

of Korea Holding.  Mr. Li was the sole shareholder and director of Korea Holding

and was also the director of Hyundai HZ.  On July 17, 2008, pursuant to an

ownership transfer agreement, CIL acquired a 100% interest in Hyundai HZ from

Korea Holding. Hyundai HZ became a subsidiary of CIL thereafter.

56.    On October 20, 2009, CIL entered into a share exchange agreement

with China Intelligent Electric Holding Ltd. BVI ("China Intelligent BVI") and the

sole shareholder of China Intelligent BVI.  Pursuant to the share exchange

agreement, as amended by Amendment No. 1 dated November 25, 2009 and

Amendment No. 2 dated January 15, 2010 (collectively, the "Exchange

Agreement"), CIL agreed to issue an aggregate of 7,097,748 shares of its common

stock in exchange for all of the issued and outstanding share capital of China

Intelligent BVI (the "Share Exchange") and the shares referred to as "Share

Exchange shares."  On January 15, 2010, the Share Exchange closed and China

Intelligent BVI became CIL's wholly-owned subsidiary and CIL immediately

changed its name from "SRKP 22, Inc." to "China Intelligent Lighting and

Electronics, Inc."  CIL issued a total of 7,097,748 shares to Defendant Li Xuemei,

the sole shareholder of China Intelligent BVI, and her designees in exchange for all

of the issued and outstanding capital stock of China Intelligent BVI.  The share

exchange closed on January 25, 2010.

57.    Prior to the closing of the Share Exchange and the Private Placement,

described below, CIL stockholders cancelled an aggregate of 2,130,195 shares such

that there were 1,418,001 shares of common stock outstanding immediately prior to

the Share Exchange.  CIL stockholders also canceled an aggregate of 2,757,838

warrants to purchase shares of common stock held by them such that they held an

aggregate of 790,358 warrants immediately prior to the Share Exchange.  Each

warrant was entitled to purchase one share of CIL common stock at $0.0002.

58.    On January 15, 2010, concurrently with the close of the Share

Exchange described above, CIL closed a private placement of shares of common

stock (the "Private Placement").  CIL stated that the net proceeds from the Private

Placement were to be used for working capital.  Pursuant to subscription

agreements entered into with the investors, CIL sold an aggregate of 1,377,955

shares of common stock at $2.54 per share, for gross proceeds of approximately

$3.5 million.  CIL paid WestPark a placement agent commission equal to 8% of the

gross proceeds from the financing and a 4% non-accountable expense allowance.

CIL also agreed to retain WestPark for a period of six months following the closing

of the Private Placement to provide it with financial consulting services, for which

CIL agreed to pay WestPark $6,000 per month.

59.    CIL agreed to file a registration statement covering the common stock

sold in the private placement within 30 days of the closing of the Private Placement

pursuant to the subscription agreement entered into with each investor and to cause

such registration statement to be declared effective by the SEC no later than 150

days from the date of filing or 180 days from the date of filing if the registration

statement was subject to a full review by the SEC.  CIL filed the registration statement on February 16, 2010.

## VI.

## CIL PUBLIC OFFERINGS AND SALE OF COMMON STOCK

60.    On or about June 17, 2010, the SEC declared effective a Registration Statement (No. 333-164925) for two sets of CIL shares.  This had the effect of making these shares eligible for public resale, as follows.[3]

(a)    First, CIL registered and sold 3,350,000 newly issued shares, through an offering underwritten by WestPark and Rodman & Renshaw, with proceeds going to CIL.  This IPO was made pursuant to the IPO Registration Statement.

(b)    Second, CIL registered the Private Placement Shares for resale, with proceeds going to the resellers.  The resale of the Private Placement shares was made pursuant to the IPO Registration Statement, and the Initial Resale Prospectus filed with the SEC on July 27, 2010.  The Initial Resale Prospectus stated that these reselling stockholders did not have a material relationship with CIL other than as a shareholder at any time within the past three years ("Initial Reselling Stockholders").

_____

[3] On June 15, 2010, Rodman & Renshaw and WestPark sent a letter to the SEC urging it to accelerate the effective date of CIL's Registration Statement.

61.    The June 17, 2010 Registration Statement was signed by each of the Individual CIL Defendants and included financial statements audited by MaloneBailey and Kempisty.  The two Prospectuses also included financial statements audited by MaloneBailey and Kempisty.  At the conclusion of the IPO and the Initial Resale there were 4,727,955 CIL common shares available for sale on the public market.

62.    On December 15, 2010, the SEC declared effective a Registration Statement (No. 333-170943) for the Secondary Resale.  The reselling stockholders included, among others, Defendants Westpark (1,122,327 shares), Rappaport (193,333), Pintsopoulos (120,833 shares), and two of Rappaport's family trusts (108,750) of which he is trustee (collectively the "Secondary Reselling Stockholders").  The Secondary Reselling Stockholders sold their shares pursuant to a Prospectus filed with the SEC on December 16, 2010.  The Secondary Offering Documents were signed by each of the Individual CIL Defendants.  MaloneBailey gave its consent to incorporate its audit opinion on the Company's financial statements as of December 31, 2009.  Kempisty gave its consent to incorporate its audit opinion on China Intelligent BVI's financial statements as of December 31, 2008.  The Prospectus also included the financial statements audited by MaloneBailey and Kempisty.  At the conclusion of the IPO and the Initial Resale there was a public market of 6,586,278, common shares of CIL.

63.     Other than the shares registered pursuant to the Registration

Statements declared effective by the SEC on June 17, 2010 and December 15,

2010, there were no other shares registered for resale before the end of the Class

Period.  Specifically,

a.     The Share Exchange CIL shares (7,097,748) were subject to a

lock-up agreement that prevented their resale, pledge, transfer, or disposal until

December 2012.

b.     A block of 649,989 shares held by WestPark after the Secondary

Resale were subject to lock-up until 12 months after CIL first began trading on the

NYSE Amex LLC, *i.e.* June 2011.

c.     A block of 25,000 shares underlying options for Defendant

Jiang were registered for resale, but Defendant Jiang never exercised the options.

64.     The following chart shows the IPO aftermarket for CIL's shares:

|  | Share Exchange | IPO | Primary Resale | Secondary Resale |
|---|---|---|---|---|
| Sold Pursuant to Registration Statement | No | Yes | Yes | Yes |
| Date Entered Aftermarket | Never | 06/17/10 | 06/17/10 | 12/15/10 |
| Underwriter | No | Yes | No | No |
| Amount of Shares for sale on NYSE AMEX | None | 3,350,000 | 1,377,955 | 1,858,323 |

65.     Pursuant to the foregoing, anyone who purchased shares in the

aftermarket purchased shares that were originally registered pursuant to one of the

two Registration Statements above.  As a result, all persons and entities who purchased shares in the aftermarket can trace their shares to one of the two Registration Statements and three Prospectuses.

66.    Both Registration Statements and each Prospectus included the same materially false financial statements and audit opinions and overstated CIL's revenue and other financial information by the same amounts.  Therefore, each purchaser of CIL shares on the NYSE AMEX stock market following the IPO can trace their CIL shares to the identically false Registration Statements.

## VII.

## FALSE STATEMENTS IN THE
## REGISTRATION STATEMENTS AND PROSPECTUSES

67.    Each of the Offering Documents included CIL financial statements for the Fiscal Years ended December 31, 2008 and 2009.  Kempisty provided an audit opinion on the CIL financial statements for the Fiscal Year Ended December 31, 2008.  MaloneBailey provided and audit opinion on the CIL financial statements for the Fiscal Year Ended December 31, 2009.

68.    Material financial results for the Fiscal Years ended December 31, 2008 and 2009 contained in CIL's SEC filings are as follows:

| In USD | Year Ended December 31, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Revenue | 59,261,297 | 42,943,934 |
| Gross Profit | 13,572,807 | 9,990,118 |
| Net income | 7,579,820 | 5,767,806 |
| Total assets | 24,157,931 | 13,906,261 |
| Shareholder equity | 17,894,643 | 10,265,170 |

69.    The sole source of revenue and income for the Fiscal Years 2009 and

2010 for CIL and the companies it would acquire via reverse merger was the

Chinese operating subsidiary Hyundai HZ.[4]

70.    CIL's financials reported to the SAIC are materially different than

those reported in the Offering Documents.  Hyundai HZ's SAIC filing reported as

follows:

---

[4] Although CIL also acquired Korea Holding, Korea Holding was a holding
company that had no assets other than Hyundai prior to the reorganization.
Therefore, when Hyundai's ownership was transferred to China Intelligent, Korea
Holding had no assets.  As a result, the only relevant figures are those of Hyundai's.

| In USD[5] | Year ended December 31, 2009 | Year ended December 31, 2008 |
|---|---|---|
| Revenue | 13,472,665.04 | 14,776,975.35 |
| Gross profit | 27,288.71 | 1,301,777.37 |
| Net income (loss) | (776,310.35) | 1,067,858.67 |
| Total assets | 12,030,102.00 | 10,110,589.34 |
| Shareholders' equity | 3,233,576 | 3,957,735 |

71.    This chart compares the fiscal year-end 2009 results filed with the SEC and SAIC and shows the dollar amount and percentage amount that CIL's financial statements in the Registration Statements overstated various financial metrics that were material to purchasers of CIL stock:

| In USD | 2009 SEC | 2009 SAIC | Overstatement Amount in USD | Percentage Overstated |
|---|---|---|---|---|
| Revenue | 59,261,297 | 13,472,665 | 45,788,632 | 340% |
| Gross Profit | 13,572,807 | 27,288 | 13,545,518 | 49,638% |
| Net income (loss) | 7,579,820 | -776,310 | 8,356,130 | Turned loss into large profit |
| Total assets | 24,157,931 | 12,030,102 | 12,127,829 | 101% |
| Shareholders' equity | 17,894,643 | 3,233,576 | 14,661,067 | 453% |

72.    The following chart compares the fiscal year-end 2008 results filed with the SEC and SAIC and shows the dollar amount and percentage amount that

---

[5] Assumes an exchange rate of 6.92 for the year ended December 31, 2008, and an exchange rate of 6.83 for the year ended December 31, 2009.

CIL's financial statements in the Registration Statements overstated various

financial metrics that were material to purchasers of CIL stock:

| In USD | 2008 SEC | 2008 SAIC | Overstatement Amount in USD | Percentage Overstated |
|---|---|---|---|---|
| Revenue | 42,943,934 | 14,776,975 | 28,166,959 | 191% |
| Gross Profit | 9,990,118 | 1,301,777 | 8,688,341 | 667% |
| Net income (loss) | 5,767,806 | 1,067,858 | 4,699,948 | 440% |
| Total assets | 13,906,261 | 10,110,589 | 3,795,672 | 38% |
| Shareholders' equity | 10,265,170 | 3,957,735 | 6,307,435 | 159% |

73.    CIL's financial statements filed with the SAIC more accurately

reflected CIL's true revenue, gross profit, net income, assets and shareholders

equity for the following reasons.

74.    Hyundai HZ was required to file annual financial statements with

SAIC as part of a required annual report.  Because Hyundai HZ was classified as a

Wholly Foreign Owned Enterprise, its SAIC Filings were required to be audited by

a PRC licensed auditing firm.[6]

75.    Hyundai HZ's fiscal 2009 annual financial statements filed with SAIC

were audited by Huizhou Dongfang CPA Firm Co., Ltd.  The audit opinion stated

that "the Company's financial statements have been prepared in accordance with

the Accounting Standards for Business Enterprises and the Accounting Regulations

---

[6] *See, e.g.*, KPMG, Expanding your horizons?  A guide to setting up business across
the Asia Pacific Region, at 15 *available at*
http://www.kpmg.de/docs/Expanding_your_horizons_China.pdf at 5, (last visited
3/5/12).

for Business Enterprises, and they have fairly reported from all material aspects of

the company's financial situation as of December 31, 2009, as well as business

performance and cash flow for the year 2009."[7]   These accounting principles are

issued by the Ministry of Finance of the People's Republic of China and are

considered by Chinese accounting professionals to be PRC GAAP.

76.    The 2009 annual report Hyundai HZ filed with SAIC was signed by

defendant Li Xuemei.

77.    CIL's 2008 annual report and financial statements filed with SAIC

contain the same audit opinion providing that Hyundai HZ's 2008 financial

statements were prepared in accordance with PRC GAAP.  Similarly, defendant Li

Xuemei signed Hyundai HZ's 2008 annual report containing its 2008 audited

financial statements.

78.    Businesses that file false SAIC filings face a variety of penalties,

including fines and revocation of the entity's business license.[8]  If an entity's

business license is revoked, the People's Bank of China[9] requires that the bank

---

[7] Specifically, ASBE (2002).

[8] "Measures for the Annual Inspection of Enterprises" issued in February 24, 2006, Article 20.

[9] People's Bank of China is equivalent to the Federal Reserve in the U.S.

account of that entity be closed.[10]  Without a business license, the entity cannot

legally conduct business in the PRC.

79.    Reflecting their importance, SAIC filings must be signed by the legal

representative of the entity submitting it.  The legal representative must state "I

confirm that the content of the submitted company's annual inspection report is

true."

80.    Therefore, Hyundai was highly incentivized to report accurate

financials to the SAIC.

81.    As further evidence of SAIC filings' reliability, well-known auditing

firm Deloitte & Touche Tomatsu LLP ("DTT") noisily resigned as registered

independent auditor to Chinese-based company ChinaMedia Express Holdings, Inc.

("CCME"), citing in part the fact that CCME's subsidiary's SAIC filings did not

match CCME's SEC filings.

82.    The attorneys for CIL in the IPO, K & L Gates LLP, represented to the

U.S. Securities & Exchange Commission (the "SEC") in an October 27, 2010 letter

that: "The basic accounting principles and practice of Chinese GAAP are similar to

US GAAP. There are no substantial differences between Chinese GAAP and U.S.

GAAP." [11]

---

[10] "Measures for the Administration of RMB Bank Settlement Accounts" issued in
April 2003 (No.5 [2003]), Article 49.

[11]  The letter was on behalf of another one of Tianfu Li's companies, China Century
Dragon Media, Inc., that went public through WestPark in an identical process.

83.    Authoritative bodies have specifically noted that there are no differences between U.S. GAAP and Chinese GAAP.  Thus, the Committee of European Securities Regulators, in a paper entitled CESR's advice on the equivalence of Chinese, Japanese and US GAAPs 25 (2007), noted that there were no significant differences between US GAAP and International Financial Reporting Standards ("IFRS").  *Id.* at 2nd entry on page.  There are no significant differences between IFRS and Chinese GAAP on revenue recognition.  *Id.* at 35, 6th entry on page.  Thus, there are no significant differences between U.S. GAAP and Chinese GAAP on revenue recognition and there are no significant differences between U.S. GAAP and Chinese GAAP that can explain the differences in the SAIC financial statements as herein alleged.

84.    Lead Plaintiffs have retained LehmanBrown, an experienced certified public accounting firm based in the PRC, to examine CIL's financial statements in its SAIC filings and compare them against CIL's financial statements in the Registration Statements to evaluate whether the lower revenue and profit in CIL'S SAIC filings can be attributed to differences between U.S GAAP and PRC GAAP. [12,13]

---

[12]    LehmanBrown is "[a] China-focused accounting, taxation and business advisory firm, LehmanBrown operates dedicated offices in Beijing, Shanghai, Hong Kong, Macau, Shenzhen, Guangzhou and Tianjin and manages an extensive affiliate network providing service throughout China."  Source:  www.LehmanBrown.com.
[13]    The senior CPA at LehmanBrown provided the opinion that differences in application of PRC GAAP and US GAAP are not the reason for differences between NIVS financial statements in the PPM and SAIC filings is Sim Joh

85.    LehmanBrown has opined that differences between application of PRC

GAAP to the SAIC filed financial statements and application of US GAAP to CIL's

financial statements in the PPM are not the reason that revenue, gross profit and net

income reported in CIL's financial statements filed with the SAIC show materially

lower revenue and profit than its financial statements in the Registration

Statements.  LehmanBrown's opinion is as follows:

a.    From our [LehmanBrown's] review of the financial statements

of CIL filed with the SAIC from 2006 to 2009, we noted that they were prepared in

accordance with the Accounting Standards for Business Enterprises (ASBE 2002)

and the Accounting Regulations for Business Enterprises (ARBE) issued by the

Ministry of Finance of the People's Republic of China (namely "PRC GAAP").

b.    A new set of Accounting Standards for Business Enterprises

(ASBE 2006) was promulgated on 15 February 2006 and effective on 1 January

2007. However non-PRC listing companies are not required to adopt the new

accounting standards. As a result, CIL did not adopt these new accounting

standards and continue to apply ASBE 2002 and ARBE for fiscal years from 2007

to 2009.

c.    CIL generates revenues from sales of intelligent lighting

products including LED, residential commercial, outdoor and municipal

engineering lighting products for the domestic and international market. The criteria

---

Khuang.  He has been in the accounting and auditing field for 16 years, spending
his first 10 years with PricewaterhouseCoopers (PwC Malaysia and PwC
Beijing) before joining LehmanBrown (in China) in February 2006.  His clients in
LehmanBrown are primarily foreign invested enterprises ('FIE'), with a few
domestic Chinese companies, including those seeking listing in US via reversed
merger.  He is involved in the audit of these FIEs, which mostly still apply  ASBE
2002 and ARBE.  For some of these FIEs, as their parent companies are US
companies, he is also engaged for special audit or quarterly review with the
objective of producing financial statements that are in compliance with US GAAP.

for revenue recognition on sales of goods are stipulated in ARBE Clause 85,

Section 5.

> Revenue from sales of goods is recognized when all the following
> criteria are satisfied:
>
> 1)    significant risks and rewards of the ownership of goods have
> been transferred to the buyers;
> 2)    the    enterprise    retains    neither    continuing    managerial
> involvement to the degree usually associated with ownership nor
> effective control over the goods sold;
> 3)    the economic benefits associated with the transactions will flow
> to the enterprise; and
> 4)    the relevant amount of revenue and cost can be measured
> reliably.

      d.    The financial statements of CIL offered to Investors were

prepared in accordance with US GAAP.  Revenue recognition for sales of goods

regulated by SAB 104 is as below:

> Sales are recognized when the following four revenue criteria are met:
>
> 1)    persuasive evidence of an arrangement exists;
> 2)    delivery has occurred;
> 3)    the selling price is fixed or determinable; and
> 4)    collectability is reasonably assured.

      e.    Comprehensively, analyzing the revenue criteria, there is no

significant difference between US GAAP and PRC GAAP on revenue recognition.

Firstly, "the enterprise retains neither continuing managerial involvement to the

degree usually associated with ownership nor effective control over the goods sold"

is a kind of "persuasive evidence of an arrangement exists"; secondly, once

"delivery has occurred", under most circumstance the "significant risks and rewards

of the ownership of goods have been transferred to the buyers", thirdly,

"collectability is reasonably assured" is equal to "the economic benefits associated

with the transactions will flow to the enterprise"; and finally, if "the selling price is fixed or determinable", then "the relevant amount of revenue and cost can be measured reliably". As a result, in theory goods delivery is a key consideration for revenue recognition both under US GAAP and PRC GAAP.

        f.    In practice, a Chinese enterprise may delay or simply fail to recognize revenue upon delivery of goods, either by delaying the issuance of a VAT invoice (fapaio) or by never issuing a VAT invoice (fapaio) at all. This practice is not permitted in China for a couple of reasons. Firstly, this is tax evasion and is illegal. Secondly this does not comply with PRC GAAP.

        g.    There are other issues that could affect the gross profit and net income. One of the possible contributing factors is differences between US GAAP and PRC GAAP, in the areas such as accounting for intangible assets, assets impairment, capitalization of borrowing costs, R&D expenses, non-monetary transactions and deferred tax. We listed below some of the GAAP differences for your reference:

|  | PRC GAAP | US GAAP |
|---|---|---|
| Intangible assets amortization | All intangible assets should be amortized over the shorter of its expected useful life and the contractual or legal life, starting in the month in which it is obtained. If there is no contractual or legal life, the expected useful life should be not more than 10 years. | For long-lived intangible assets that are deemed to have infinite lives, they are not amortized. However, they should be reviewed for impairment at least annually. |
| Assets impairment | Impairment tests should be carried out annually regardless of whether there are triggering events or not. | Except for impairment of goodwill and other long-lived assets, impairment test on assets should be carried out if there is a triggering event. |
| Borrowing cost | Borrowing costs on project-specific borrowings should be capitalized as part of the cost of acquiring or constructing a tangible fixed asset. | Borrowing costs (specific or indirect) relating to the acquisition, construction or production of a qualifying asset must be capitalized. |

| | | |
|---|---|---|
| R&D expenses | All research and development costs should be recognized as an expense as incurred. The only costs that are capitalized and amortized relating to a self-created intangible are registration fees and legal costs incurred to obtain a legal right to the asset, such as a patent. | Expenditures on research should be recognized as an expense when incurred. An intangible asset arising from development should be capitalized if certain criteria are met. |
| Non-monetary transactions | No distinction is made between exchange of similar or dissimilar assets and profit or loss is generally not recognized. | Exchange of similar assets: no gains or losses should be recognized; Exchange of dissimilar assets: gains and losses are recognized based on fair value of goods received less any cash transferred. |
| Taxation | Three methods are allowed in the accounting for income tax: 1) tax payable method; 2) tax effect accounting - deferral method; 3) tax effect accounting - liability method. Under tax payable method, no deferred tax asset or liability needs to be recognized. | Liability method should be used to account for income tax. Deferred tax asset and liability must be calculated on all temporary differences. Deferred tax asset must be calculated in full; if not realizable, then a valuation allowance is made. |

h.     Other than those mentioned above, there are few other areas where there are differences between US GAAP and PRC GAAP, such as goodwill, financial instruments, investment property and leases. However, as these areas are not related to CIL (based on the information available at present), we will not discuss about these topics in further details.

i.     LehmanBrown has further reviewed the financial statements (balance sheet and profit and loss accounts) filed with SAIC and financial statements reported to investors in Prospectus for the fiscal years ended December 31, 2006 to 2009, focusing on the differences in revenue, gross profit and net income reported in financial statements filed with SAIC and those reported in Prospectus for the fiscal years. Below is a comparison of the financial figures between the filing with SAIC and those included in the Prospectus:

| | Prospectus | Filing with SAIC | Diff. | % |
|---|---|---|---|---|
| | US GAAP | PRC GAAP | | |

For the year ended December 31, 2009 USD'000

| | Prospectus US GAAP | Filing with SAIC PRC GAAP | Diff. | % |
|---|---|---|---|---|
| Cash and cash equi. | 821 | 363 | 458 | 126% |
| Accounts receivable | 13,424 | 5,365 | 8,059 | 150% |
| Inventory | 3,924 | 112 | 3,811 | 3400% |
| Other current assets | 2,538 | 5,484 | 2,946 | -54% |
| Total current assets | 20,707 | 11,324 | 9,383 | 83% |
| PPE, cost | 14 | 869 | -869 | |
| PPE, accu. depreciation | | -163 | 163 | |
| PPE, net | 3,451 | 706 | 2,745 | 389% |
| Total assets | 24,158 | 12,030 | 12,128 | 101% |
| Accounts payable | 3,579 | 6,235 | 2,656 | -43% |
| Loans | 939 | 937 | 2 | 0% |
| Other liabilities | 1,745 | 1,624 | 121 | 7% |
| Total liabilities | 6,263 | 8,797 | 2,533 | -29% |
| Equity | 17,895 | 3,234 | 14,661 | 453% |
| Revenue | 59,261 | 13,473 | 45,789 | 340% |
| COGS | -45,688 | -13,445 | 32,243 | 240% |
| Gross profit | 13,573 | 27 | 13,546 | 49638% |
| *GP%* | *23%* | *0%* | | |
| Selling expenses | -2,533 | -401 | -2,133 | 532% |
| G&A expenses | -1,464 | -365 | -1,099 | 301% |
| R&D expenses[15] | -895 | * | | |

[14] In the absence of the details to financial statements, we apply gray to the cells.
[15] Under PRC GAAP, the R&D expenses are included in G&A expenses.

| | | | | |
|---|---|---|---|---|
| Other income/expenses | -18 | -38 | 20 | -52% |
| Total profit | 8,662 | -776 | 9,439 | -1216% |
| | | | | |
| Income tax | -1,083 | - | -1,083 | |
| Net profit | 7,580 | -776 | 8,356 | -1076% |
| *Effective tax rate* | *12.50%* | | | |

|  | For the year ended December 31, 2008 USD'000 | | | |
|---|---|---|---|---|
| | Prospectus | Filing with SAIC | Diff. | % |
| | US GAAP | PRC GAAP | | |
| Cash and cash equi. | 264 | | | |
| Accounts receivable | 3,467 | | | |
| Inventory | 4,496 | | | |
| Other current assets | 2,009 | | | |
| Total current assets | 10,236 | | | |
| | | | | |
| PPE, cost | | | | |
| PPE, accu. depreciation | | | | |
| PPE, net | 3,670 | | | |
| Total assets | 13,906 | 10,111 | 3,796 | 38% |
| | | | | |
| Accounts payable | 1,736 | | | |
| Loans | - | | | |
| Other liabilities | 1,905 | | | |
| Total liabilities | 3,641 | 6,153 | 2,512 | -41% |
| | | | | |
| Equity | 10,265 | 3,958 | 6,307 | 159% |
| | | | | |
| Revenue | 42,944 | 14,777 | 28,167 | 191% |
| COGS | -32,954 | | | |
| Gross profit | 9,990 | | | |
| *GP%* | *23%* | | | |

|  |  |  |  |  |
|---|---:|---:|---:|---:|
| Selling expenses | -2,072 | | | |
| G&A expenses | -1,131 | | | |
| R&D expenses | -742 | | | |
| Other income/expenses | -277 | | | |
| Total profit | 5,768 | 1,068 | 4,700 | 440% |
| | | | | |
| Income tax | - | - | | |
| Net profit | 5,768 | 1,068 | 4,700 | 440% |
| *Effective tax rate* | | | | |

j.      Based on LehmanBrown's review of the accounting policies for the financial statements filed with SAIC for the year ended December 31, 2009 and for the financial statements reported to investors in Prospectus for the fiscal years ended December 31, 2008 and 2009, LehmanBrown is of the opinion that in the material respects, there are no significant differences in the accounting policies between US GAAP and PRC GAAP.

| | Accounting policy for filing to SAIC | Accounting policy for reporting to investors | Comments |
|---|---|---|---|
| Revenue | Revenue is recognized when the significant risks and rewards of the ownership of goods have been transferred to the buyers. | Revenue is recognized when the four criteria are met as mentioned in the early part of this memorandum. | Generally, there is no significant difference between PRC and US GAAP in respect of revenue recognition. However, the revenue reported in Prospectus is a dramatically 340% of that filed with SAIC for 2009. The possible reasons contributing to the difference may include CIL did not recognize the revenue in the accounts filed to SAIC because of delay or not issuing VAT invoices to customers, but looking at the magnitude |

| 1 | | | | of the differences from 2006 to 2009, it takes more than a GAAP difference to cause such differences. |
|---|---|---|---|---|
| 4 | | | | We further noted that CIL has a subsidiary in Hong Kong, - China Intelligent Electronic (International) Holding Limited ("CIL HK"), which is included in the consolidated financial statements in Prospectus. **We would suggest obtaining the individual financial statements of CIL HK in order to understand their operations better.** |
| 11 12 | Inventory and COGS | Inventories are stated at the lower of cost, as determined on a weighted average basis. | Same as accounting policy in filing to SAIC. | The accounting policy adopted in financial statements filed with SAIC appears to be the same as the one used to prepare the financial statements under US GAAP.  However, we noted the huge difference in closing inventory (USD 3,811K, 3400%) as of Dec 31, 2009 and COGS (USD 32,243K, 240%) for 2009 between figures reported to SAIC and in Prospectus. Based on the information available so far, we are not aware of any GAAP difference that could contribute to such huge differences. |
| 22 23 | Cash and cash equivalents | Include cash on hand, demand deposits with banks and liquid investments with an original maturity of three months or less. | Same as filing to SAIC. | The difference on cash and cash equivalents is significant (126%), although the accounting policy is the same. |

| | | | |
|---|---|---|---|
| PPE - depreciation policy | Depreciated using straight line method over estimated useful life of the assets, with residual value of 10% of historical cost. Machinery – 10 years Office equipment – 5 years | The useful lives of all assets are the same as per filing to SAIC.  However, it should be noted that there was no disclosure of residual value of PPE in the financial statements prepared under US GAAP. | Despite possibly no residual value adopted in US GAAP accounts, the impact to profit and loss account would not be significant because of GAAP difference. However, the difference in the net book value of PPE as of Dec 31, 2009 is material (USD 2,745K or 80%). |
| Borrowing cost capitalization | Borrowing costs on project-specific borrowings should be capitalized. However, in the absence of footnotes in financial statements filed with SAIC, we are not able to verify if any of the loans is project-specific and whether the interests have been capitalized. | The accounting policy of borrowing cost is not mentioned in the footnote and whether the interests are capitalized is also not disclosed. | A rough calculation seems to suggest that interest expenses are all charged out to income statement under both PRC and US GAAP. |
| Research and development cost | Expensed when it is incurred. | Same as filing to SAIC. | |
| Taxation | Tax payable method, no deferred tax need to be recognized | Liability method, deferred tax asset and liability must be calculated on all temporary differences. | No deferred tax assets or liabilities were recognized under US GAAP. No income tax was reported in filings to SAIC for fiscal years from 2006 to 2009. However, under US GAAP income tax expense of USD 1,083K was accrued for 2009. This is partly due to the tax incentive granted, 2-years of tax exemption and 50% reduction on tax payable for the subsequent 3 years. |

k.      Based on Lehman Brown's review and analysis of the limited

1    financial information that has been made available to them, or that could be

2    obtained from the public domain, LehmanBrown are not aware of any significant

3    GAAP differences that could contribute to the differences observed in revenue,

4    gross profit and net income.

5            l.      Furthermore, the differences between the financial statements

6    filed with SAIC and those included in the Prospectus are too material to be

7    explained by GAAP differences.

8

9    87.    Accounting differences do not explain the discrepancies between the

10   financial statements reported to the SAIC and the SEC.  The amounts are far too

11

12   material to be explained by differences in accounting rules.  The most plausible

13   explanation for the difference is that the amounts revenue, income and other

14   financial data CIL reported in its Registration Statements are false.

15

16   88.    In particular, there is absolutely no reason for the revenue to differ

17   340% and 191% for 2009 and 2008 because recognition of revenue is identical for

18   CIL under US and PRC GAAP.

19

20   89.    Thus, instead of buying shares in a thriving company with revenues of

21   nearly $60 million and shareholders' equity of $17 million, shareholders were

22   purchasing shares in a struggling company with revenues of only $13.5 million,

23   substantial net losses, and shareholders' equity of $3,233,576.  In sum, investors

24

25   spent approximately $10 million to acquire an asset valued at $3,233,576.  In

26   reality, the shares in the Public Offerings were only 24.5% of CIL's issued and

27

28

outstanding shares.  Therefore, the purchasers were collectively spending $10 million to acquire an asset with a true value of approximately $784,000.

90.    CIL never issued any additional audited financial statements than those referred to herein.  In particular, it never issued an annual report on Form 10-K for the period ending December 31, 2010.

## VIII.

## **THE TRUTH IS REVEALED**

91.    On March 29, 2011, CIL filed a form 8-K with the SEC that stated in pertinent part:

On March 24, 2011, the Company received a notice of resignation from MaloneBailey ("Resignation Letter") indicating that it is terminating its engagement with the Company, effective immediately. MaloneBailey informed the Company that the resignation was due to … accounting fraud involving forging of the Company's accounting records and forging bank statements, in addition to other discrepancies identified during its testing of the Company's accounts receivable. The Resignation Letter indicated that MaloneBailey believed that the accounting records of the Company have been falsified, which constitutes an illegal act.  MaloneBailey indicated that it has discussed the issues with management but with no resolution or reasonable explanation.

1

2       Furthermore, the Resignation Letter indicates that such accounting

3       fraud could indicate a material error in previously issued financial

4
        statements.   As a result, MaloneBailey indicated in the Resignation
5
6       Letter that it is unable to rely on management's representations as

7       they relate to previously issued financial statements and it can no

8
        longer support its opinions related to the financial statements as of
9
10      December 31, 2009 and condensed Parent Only financial statements,

11      included in the Registration Statement on Form S-1 filed with the

12
        Securities and Exchange Commission (the "SEC") on April 21, 2010.
13

14      92.    The 8-K included a letter from MaloneBailey to the SEC

15   stating:

16
        Due to the matters disclosed in the second paragraph under Item 4.01
17
18      of the Current Report on Form 8-K to be filed with the Securities and

19      Exchange Commission on March 29, 2011, we can no longer rely on

20
        management's representations as they relate to previously issued
21
22      financial statements and we can no longer support our opinions related

23      to the financial statements as of December 31, 2009 and condensed

24
        Parent Only financial statements, included in the Registration
25
26      Statement on Form S-1 filed with the Securities and Exchange

27      Commission (the "SEC") on April 21, 2010.

28

On March 29, 2011 the Company issued a press release announcing in relevant part (emphases added): …  On March 24, 2011, the Company received a notice of resignation from MaloneBailey ("<u>Resignation Letter</u>") indicating that MaloneBailey is terminating its engagement with the Company, effective immediately.  The Company has begun to seek to retain a new auditor.

<u>The Resignation Letter described MaloneBailey's resignation being due to accounting fraud involving forging of the Company's accounting records and forging bank statements, in addition to other discrepancies identified in the Company's accounts receivable</u>.  The Resignation Letter indicated that <u>MaloneBailey believed that the accounting records of the Company have been falsified, which constitutes an illegal act</u>.  Furthermore, <u>MaloneBailey's letter notes that the discrepancies could indicate a material error in previously issued financial statements</u>.  As a result, MaloneBailey stated that it is unable to rely on management's representations as they relate to previously issued financial statements and it can no longer support its opinion related to the Company's financial statements for the year ended and as of December 31, 2009.

\* \* \*

The Company was also recently notified by the staff of the U.S. Securities and Exchange Commission ("SEC") that it has initiated a formal, nonpublic investigation into whether the Company had made material misstatements or omissions concerning its financial statements, including cash accounts and accounts receivable. … .

In light of these events, the Board of Directors of the Company has formed a Special Investigation Committee consisting of independent members of the Board of Directors to launch an investigation with respect to the concerns of MaloneBailey.  The Committee is authorized to retain experts and advisers, including a forensic accounting firm and independent legal advisors, in connection with its investigation.  The Company does not intend to provide further comment regarding the allegations until after the conclusion of the Special Committee's investigation.

93.     On April 5, 2011, the NYSE Amex LLC provided the Company with notification that it would seek to delist the Company's shares from the NYSE Amex.  On April 7, 2011, the Company filed a Current Report on Form 8-K reporting on the notification.  It states, in relevant part:

[...] Specifically, MaloneBailey raised concerns to the Company's board of directors and management **that its accounting records may**

**have been falsified, constituting an illegal act**. The Company failed

to adequately address the concerns raised by MaloneBailey, thereby

leading to MaloneBailey's resignation as the Company's independent

auditor and the withdrawal of MaloneBailey's audit opinions, as well

as a presumption that the concerns raised are true.  Moreover, the SEC

(in declaring the Company's registration statement to be effective),

the Exchange (in approving the Company for listing) and market

participants (in making investment and trading decisions) reasonably

relied on the audit opinions in determining that the Company's

financial statements subject to such opinions were accurate, complete

and in accordance with generally accepted accounting principles and

standards.  **Thus the Company's actions and inactions which led to**

**MaloneBailey's resignation and withdrawal of its audit opinions**

**have cast material doubt on the integrity of its financial**

**statements as reasonably relied on for such purposes.**


The Company is noncompliant with Section 132(e) of the Company

Guide, which provides that a listed company is subject to delisting if

any communication (including but not limited to a communication

made in connection with an initial listing application) contains a

material misstatement or omits material information necessary to

make the communication to the Exchange not misleading.  In this

regard, the Exchange relied on the Company's registration statement

filed with the SEC on June 16, 2011, and the fact that the financial

statements contained therein were audited by MaloneBailey, in

determining that the Company qualified for initial listing on the

Exchange. **As a consequence of the withdrawal of MaloneBailey's**

**opinions, the integrity of the financial statements on which the**

**Exchange relied in making its initial listing determination has**

**been called into question, raising a concern as to whether the**

**Company was at that time qualified for listing, as well as the**

**effectiveness of its registration under Section 12(b) of the**

**Exchange Act.**  The fact that MaloneBailey withdrew its audit

opinions included in the registration statement, and that its opinions

may not now be relied upon constitutes a material misstatement and a

violation of Section 132(e) of the Company Guide.  **In this regard,**

**the Company's failure to adequately address the matters raised**

**by MaloneBailey to avoid its resignation and withdrawal of its**

**audit opinions raises concerns that the Company's financial**

**statements (which constitute communications provided in**

**connection with its initial listing application and which have been**

**relied on by the Exchange in connection with its ongoing**

**assessment of the Company's continued listing eligibility) contain**

**one or more material misstatements and/or omit material**

**necessary to make the financial statements not misleading.**

(emphases added)

94.    On April 12, 2011, the Company issued a Current Report on Form 8-K/A further commenting on MaloneBailey's charges of accounting fraud.  The Company stated, in relevant part:

On March 24, 2011, the Company received a notice of resignation from MaloneBailey ("Resignation Letter") indicating that it is terminating its engagement with the Company, effective immediately.  MaloneBailey informed the Company that the resignation was due to, as described in the Resignation Letter, accounting fraud involving forging of the Company's accounting records and forging bank statements, in addition to other discrepancies identified during its testing of the Company's accounts receivable. The Resignation Letter indicated that MaloneBailey believed that the accounting records of the Company have been falsified, which constitutes an illegal act.  MaloneBailey indicated that it has discussed

the issues with management but with no resolution or reasonable

explanation.

**Furthermore, the Resignation Letter indicates that such**

**accounting fraud could indicate a material error in previously**

**issued financial statements.  As a result, MaloneBailey indicated in**

**the Resignation Letter that it is unable to rely on management's**

**representations as they relate to previously issued financial**

**statements and it can no longer support its opinions related to the**

**financial statements as of December 31, 2009 and condensed**

**Parent Only financial statements, included in the Registration**

**Statement on Form S-1 filed with the Securities and Exchange**

**Commission (the "SEC") on April 21, 2010.**

95.    On June 10, 2011, the Company filed a Post-Effective Amendment to

its Registration Statements previously filed on December 15, 2010 and June 16,

2010.  The sole purpose of the amendments was "to deregister all of the securities

previously registered under the Registration Statement that remain unsold and to

terminate the effectiveness of the Registration Statements."

96.    On July 22, 2011, the SEC issued an order suspending the

effectiveness of the Registration Statements .   The SEC order made findings of fact

that the Registration Statements falsely state that each contains audited financial

statements and the report of an independent registered public accounting firm, when

in fact the auditor has withdrawn its audit report.  As a result, the Registration

Statements each include an untrue statement of a material fact.

## IX.

## THE UNDERWRITERS WERE NEGLIGENT

97.     Section 11 of the Securities Act provides that underwriters are liable

for any material false statement in a registration statement. [15 U.S.C. § 77k(a)(5)].

98.     Section 12 of the Securities Act provides that any person who "offers

or sells a security [...] by means of a prospectus or oral communication, which

includes an untrue statement of a material fact" is liable.  [15 U.S.C. § 77*l*(a)(2).]

99.     The underwriters offered or sold CIL's securities in the IPO.  In

particular, on June 15, 2010, John Borer on behalf of Rodman and Richard

Rappaport on behalf of WestPark filed a letter with the SEC stating they had

disseminated an electronic copy of the preliminary prospectus to each underwriter

and dealer participating in the Offering, and instructed each dealer to distribute the

prospectus to each of its customers.[16] All told, the Underwriters disseminated

approximately 1,200 preliminary prospectuses.[17]

100.   In addition, it is commonly understood in the underwriting industry

that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the

---

[16] Letter from John Borer and Richard Rappaport to Larry Spirgel, Assistant
Director, SEC, dated June 15, 2010, available at
http://sec.gov/Archives/edgar/data/1421525/000114420410033508/filename1.htm.
[17] *Id.*

prospectus and registration statement.[18]  Underwriters "assist the issuer in providing

an offering document to investors that discloses all material information relevant to

the offering."[19]

101.   The Underwriters had ultimate control over the contents and

dissemination of the Registration Statements.  They must ensure full disclosure is

provided or not underwrite the offering, if full disclosure is not provided.

102.   Similarly, Judge Cote of the Southern District of New York has held

that "If red flags arise from [an underwriter's] reasonable investigation,

underwriters will have to make sufficient inquiry to satisfy themselves as to the

accuracy of the financial statements, and if unsatisfied, they must demand

disclosure, withdraw from the underwriting process, or bear the risk of liability."  *In

re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 684 (S.D.N.Y. 2004).

103.   Both Section 11 and Section 12 provide that underwriters are liable for

damages resulting from materially false misstatements contained in a prospectus or

registration statement.

104.   Underwriters may only escape liability if they are able to establish one

of two <u>affirmative</u> defenses available to them:  that they conducted reasonable due

diligence, or that the false statements did not cause the plaintiffs' losses.

105.   As to due diligence, it is common in the industry for underwriters to

_____

[18] Goldman Sachs, Report of the Business Standards Committee, January 2011, at
13.
[19] *Id.*

compile a detailed "due diligence memorandum".

106.   The underwriters are the gatekeepers and are expected to thoroughly investigate the issuer of securities in the offering to ensure that the Registration Statement and Prospectus accurately reflect the financial and business condition of the issuer.

107.   It is well accepted and understood in the investment banking and financial communities that a reasonable due diligence investigation refers to an **affirmative duty** to verify the accuracy of disclosure concerning securities offerings; it also refers to the thorough investigation that is expected as part of virtually every issuance of securities.  This view regarding what is expected from a reasonable due diligence investigation is confirmed by many texts.  For example, (i) *Conducting Due Diligence 2002* and *Conducting Due Diligence 2005*, both published by the Practicing Law Institute; (ii) *Due Diligence Periodic Reports and Securities Offerings*, annual editions each year 2004 through 2010, by Professor Robert J. Haft and Arthur J. Haft; Thomson West; and (iii) *Corporate Finance and the Securities Laws*, by Charles J. Johnson, Jr. and Joseph McLaughlin; Aspen Publishers, 2004.  The due diligence responsibility is the ***primary*** responsibility of investment banks. Also, as stated previously, the SEC has stated that: "Congress recognized that underwriters occupied a ***unique*** position that enabled them ***to discover and compel disclosure*** of essential facts about the offering."

108.   In summary, within the investment banking industry, the "duty to

disclose" material information is an absolute requirement.  Indeed, one of the foundations of the investment banking and securities business is the premise of full disclosure - and full disclosure means ***both*** not making any misleading statements in setting forth material facts and also making sure that there are no omissions of material facts.

109.   The due diligence process by an investment bank is to be rigorous and thorough, with professional skepticism to be applied. The due diligence process is ***not*** just a "ho-hum" exercise of accepting a company's/management's views or their auditor's opinion at face value.  The due diligence process is in fact the opposite.  The investment bank should act as a "devil's advocate" by digging and probing within a company.  The investment bank should cross examine participants by asking many questions; should obtain and analyze various information, including any business financial models and projections; and should follow-up with more work as appropriate, depending upon what is learned and what "red flags" surface, if any.  As Professor Robert J. Haft[20] stated in his previously mentioned text: "The underwriter should look upon due diligence primarily as an attempt to find 'red flags' which indicate potential danger. To assist in this search, the underwriter should not hesitate to utilize experts [and attorneys] whenever it feels that neither the corporate finance department nor the firm at large has the expertise

---

[20] Professor Haft, a Professor of Law at Georgetown University, has been actively engaged in the securities field for over forty years and was on the staff of the SEC as Special Counsel for four years.

necessary to analyze a fundamentally important aspect of a company's business. The underwriter should be prepared to pay whatever is reasonably necessary for expert advice, recognizing that in the final analysis it may well save money." (Page 13 of the 2004-2005 text).

110.    The statements by the issuer about its own financial condition are not accepted by the investment bank at face value *without* adequately questioning the company's auditors and its accounting and financial officers.

111.    The Underwriters were aware of the following red flags that they should have, but did not, investigate:

a.    The CIL IPO involved a Chinese company with a complex corporate structure.  All of CIL's revenue and income were derived from operations in China.  The risk factors, covering over a dozen pages of text, are all boilerplate. None involve actual risks that were clearly evident at the time.

b.    CIL's financial statements showed an incredible rate of growth. Revenues grew by 260% in 2008 and 37% in 2009.  In such circumstances, it was incumbent upon the Underwriters to determine whether CIL's revenue growth was too good to be true, rather than just blindly accept management's representations.

c.    MaloneBailey is a Houston, Texas-based auditing firm that audits a number of WestPark clients in China.  MaloneBailey did not retain an independent auditor to audit its clients located on the other side of the world, that conduct business in a completely different language, in a completely different

business culture. Instead it utilized four independent contractors to complete the

field work in China. Indeed, according to MaloneBailey partner George Qin, until

MaloneBailey conducted 2010 audits, MaloneBailey never even independently

obtained documents or verified that documents were not forged.  Hence it was

highly unreasonable for the underwriters to rely upon MaloneBailey's work

product.

           d.     All of CIL's revenue derives from Hyundai HZ.  Hyundai HZ is

required to file audited financial statements with the SAIC.  The SAIC financial

statements are signed by defendant Li Xuemei, the Chief Executive and a director

of CIL.  The SAIC financial statements are massively discrepant with those in the

Registration Statements.  It was highly unreasonable for the Underwriters not to

have obtained these SAIC financial statements and questioned CIL's PRC

accounting firm about the differences.

# X.

## ACCOUNTING DEFENDANTS' NEGLIGENCE

        112.   The Accounting Defendants each certified that "we have conducted

our audit in accordance with standards of the Public Company Accounting

Oversight Board (United States).  Those standards require that we plan and perform

the audit to obtain reasonable assurances about whether the financial statements are

free of material misstatements [...]  We believe that our audit provides a reasonable

basis for our opinion.  [Paragraph break].  In our opinion, the consolidated financial

statements referred to above present fairly, in all material respects, the financial

position of China Intelligent Lighting and Electronics."

113.   The Accounting Defendants each consented to have their audit

opinions used in all of the Registration Statements.

114.   Generally Accepted Auditing Standards ("GAAS") requires that the

auditor understand the client's industry and business, and be knowledgeable about

matters that relate to the nature of the entity's business, its organization, and

operating characteristics.  AU 310.07.

115.   For financial statements audited prior to December 15, 2010 "GAAS

requires that sufficient competent evidential matter is to be obtained through

inspection, observation, inquiries, and confirmations to afford a reasonable basis for

an opinion regarding the financial statements under audit."  AU 150.02.3.

116.   Auditing Standard No. 15 ¶10 provides that "[w]hen using information

produced by the company as audit evidence, the auditor should [...] [t]est the

accuracy and completeness of the information."

117.   Auditing Standard No. 15 ¶22 requires auditors to "design[]

substantive tests of details and tests of controls [to] determine the means of

selecting items for testing from among the items included in an account or the

occurrences of a control."

118.   Upon information and belief, none of the Accounting Defendants

obtained sufficient evidential matter to support their audit opinion regarding the

financial statements.  Since CIL only had one tenth the revenue it claimed in its SEC filings, a competent audit would have uncovered evidence that sales CIL claimed happened in fact never took place.

119.   Auditing Standard No. 12 ¶9 requires the auditor to "obtain an understanding of relevant industry, regulatory, and other external factors [...] including the legal and political environment."  Auditing Standard No. 12 ¶11 provides that "the auditor should consider [...] [r]eading public information about the company relevant to the likelihood of material financial statement misstatements".

120.   Auditing Standard No. 15 ¶29 provides that "[i]f audit evidence obtained from one source is inconsistent with that obtained from another, or if the auditor has doubts about the reliability of information to be used as audit evidence, the auditor should perform the audit procedures necessary to resolve the matter."

121.   Upon information and belief, the Accounting Defendants did not consult and were therefore negligent in not consulting CIL's subsidiary's publicly available, audited financial statements filed with the SAIC.

122.   If the Accounting Defendants did consult CIL's subsidiary's publicly available audited financial statements filed with the SAIC, they were negligent in failing to note the discrepancies between SAIC and SEC filings.  For key statistics, ranging from net assets to gross profits, SAIC reported numbers were anywhere from half to one thousandth of those reported in SEC filings.  For net income, SAIC

filings in 2009 indicate a loss of $776,310.35, while SEC filings indicated profits of

$7,579,820.  Any non-negligent auditor would have been alerted by these glaring

discrepancies.

123.   Auditing Standard No. 12 ¶65 provides that "the auditor should

evaluate whether the information gathered from the risk assessment procedures

indicates that one or more fraud risk factors are present and should be taken into

account [...] Fraud risk includes (1) an incentive or pressure to perpetrate fraud, (2)

an opportunity to carry out the fraud."

124.   AU §316.85A.2, which is entitled "Risk Factors Relating to

Misstatements Arising From Fraudulent Financial Reporting" specifically provides

that auditors should consider fraud risk where "[s]ignificant operations [are] located

or conducted across international borders in jurisdictions where differing business

environments and cultures exist."

125.   The Accounting Defendants failed to consider, among other things,

that the Defendants, based in the People's Republic of China, were effectively

beyond the reach of the SEC and United Stated Department of Justice's ("DOJ")

enforcement of the securities laws, and could therefore violate the securities laws

without fear of civil or criminal enforcement from the SEC or DOJ, respectively.

126.   Upon information and belief, the Accounting Defendants never

conducted the audit work necessary to resolve the discrepancy between CIL's SAIC

filings and its SEC filings, or the discrepancy that would have arisen had the

auditors consulted with a significant proportion of CIL's customers.

127.    MaloneBailey was one of just a few audit firms who audited a number

of Chinese-based clients.  MaloneBailey finally discovered that four of its clients --

all also clients of WestPark -- had committed fraud on a massive scale in late March

2011.  Trading in all four of these companies' stock was halted because of fraud.

128.    Soon after this collapse, *TheStreet* interviewed George Qin, the partner

in charge of Chinese clients at MaloneBailey.[21]

129.    Qin attributed MaloneBailey's discovery that several of its clients had

been engaged in fraud to MaloneBailey's decision to employ procedures to detect

fraud.  These procedures were as simple as obtaining bank statements from the

banks themselves (rather than the issuer) and attempting to determine whether bank

statements were forged.

130.    When asked why MaloneBailey had not used these simple procedures

in previous years' audits -- before WestPark's frauds were unleashed on U.S.

capital markets, before they could launch their IPO, before U.S. investors could be

fooled into exchanging their hard-earned dollars for worthless shares -- Qin stated:

> "We didn't know there was so much fraud in China when we did the 2009
>
> audit.  We noticed this in 2010; that's why we designed those procedures.

---

[21] Full text of article available at http://www.thestreet.com/story/11073056/1/la-
firms-china-ventures-turn-sour-pt-1.html

But you're right.  From hindsight, if we have done the same procedures in the

2009 audit, we would have caught the errors of fraud last year."

## XI.

## <u>PROOF OF RELIANCE IS UNNECESSARY</u>

131.    There is no need for Lead Plaintiffs or the Class to prove reliance.  Section

11(a) of the Securities Act, 15 U.S.C. §77k(a), specifically provides that plaintiffs need

not show reliance "if the issuer has not made available an earnings statement covering a

period of at least twelve months beginning after the effective date of the registration

statement."  15 U.S.C. §77k(a).  In this case, this would be CIL's Annual Report for the

year ending December 31, 2010, on Form 10-K.  This annual report was never released.

Therefore, proof of reliance is unnecessary.

132.    Reliance is not an element of a claim arising under Section 12 of the

Securities Act, 15 U.S.C. § 77l.  Therefore, Plaintiffs need not prove reliance as to their

Section 12 claims.

## XII.

## <u>FIRST CLAIM</u>

### Violation of Section 11 of the Securities Act
### <u>Against all Defendants Except Rappaport, Rubin and Borer</u>

133.    Lead Plaintiffs repeat and reallege each and every allegation contained

above as if fully set forth herein.  This claim is not based on fraud, does not allege

fraud, and does not sound in fraud.

134.   This claim is asserted by Lead Plaintiffs against all Defendants except Rappaport, Rubin and Borer, by, and on behalf of all persons who acquired shares of the Company's securities pursuant to and/or traceable to the IPO Registration Statement.

135.   This claim is asserted by Lead Plaintiffs against all Defendants except WestPark, Rodman & Renshaw, Rappaport, Rubin and Borer, by, and on behalf of all persons who acquired shares of the Company's securities pursuant to and/or traceable to the Secondary Resale Registration Statement.

136.   The CIL Individual Defendants Xuemei, Jiang, Shiliang, Askew, Yang and Hongfeng each signed the IPO Registration Statement and each signed the Secondary Resale Registration Statement.

137.   The Underwriter Defendants were underwriters of the IPO and the shares registered pursuant to the IPO Registration Statement within the meaning of Section 11 of the Securities Act, 15 U.S.C. § 77k(a)(5).

138.   The Accounting Defendants provided audit opinions regarding CIL's financial statements in the IPO Registration Statement.

139.   The Underwriter Defendants owed to the purchasers of the securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct

and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

140.    The Accounting Defendants owed Plaintiff a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

141.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

142.    As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, the market price of CIL's securities sold in the Offering was artificially inflated, and Lead Plaintiffs and the Class suffered substantial damage in connection with their purchase of CIL's securities pursuant to the Registration Statement.

143.    CIL is the issuer of the securities sold via the Registration Statement. As issuer of the securities, the Company is strictly liable to Lead Plaintiffs and the Class for the material misstatements and omissions therein.

144.    At the times they obtained their shares of CIL, Lead Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

145.    This action is brought within one year after discovery of the untrue statements and omissions in the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement.

146.    No earnings statement covering a period of at least twelve months beginning after the effective date of the Registration Statements was ever issued.

147.    By virtue of the foregoing, Lead Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.


## XIII.

### SECOND CLAIM
**Violation of §12(a)(2) of the Securities Act**
**Against Rodman & Renshaw and WestPark**

148.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

149.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of all purchasers of CIL stock directly from Underwriters Rodman &

Renshaw and WestPark in the IPO.   This claim is brought only against the Underwriters.

150.   Rodman & Renshaw and WestPark were sellers, offerors, underwriters and solicitors of sales of the CIL securities offering pursuant to the IPO Registration Statement and Prospectus in the IPO.

151.   Defendants actively solicited the Plaintiffs' purchases of CIL shares in the IPO.

152.   The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus.

153.   Defendants owed to the purchasers of CIL securities which were sold in the Offering pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering materials as set forth above.

154.   Lead Plaintiffs and the members of the Class purchased or otherwise acquired CIL securities pursuant to and traceable to the defective Prospectus.

Plaintiffs did not know, or in the exercise of reasonable diligence could not have

known of the untruths and omissions.

155.    Lead Plaintiffs, individually and representatively, hereby offer to

tender to Defendants those securities acquired pursuant to the defective Prospectus

which Lead Plaintiffs and the members of the class continue to own, on behalf of

all members of the Class who continue to own such securities, in return for the

consideration paid for those securities together with interest thereon.

156.    By reason of the conduct alleged herein, the Defendants named in this

Claim violated, and/or controlled a person who violated, section 12(a)(2) of the

Securities Act. Accordingly, Lead Plaintiffs and members of the Class who hold

CIL securities purchased directly from the Underwriters in the IPO have the right to

rescind and recover the consideration paid for their CIL securities and, hereby elect

to rescind and tender their CIL securities to the Defendants sued herein. Lead

Plaintiffs and Class members who have sold their CIL securities are entitled to

rescissory damages.

157.    Less than three years have elapsed from the time that the securities

upon which this claim is brought were offered and sold to the public.  Less than one

year has elapsed from the time when Lead Plaintiffs discovered or reasonably could

have discovered the facts upon which this Claim is based.

**XIV.**

# THIRD CLAIM

## Violations of Section 15 of the Securities Act
## Against the Individual Defendants

158.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

159.   This claim is asserted on behalf of Lead Plaintiffs and all Class members against each of the Individual Defendants, each of whom was a control person of a primary violator liable pursuant to the first and second claims under Sections 11 and 12 during the Class Period.

160.   The primary violators, liable under Section 11 for purposes of this claim under Section 15 are CIL, WestPark, Rodman & Renshaw, Kempisty, and MaloneBailey.

161.   The primary violators liable under Section 12 for purposes of this claim under Section 15 are WestPark and Rodman & Renshaw.

162.   Li Xuemei and Kui Jiang were control persons of CIL.

163.   Richard Rappaport was a control person of WestPark.

164.   Edward Rubin and John Borer were control persons of Rodman & Renshaw.

165.   None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material

respects.  Had they exercised reasonable care, they should have known of the

material misstatements and omissions alleged herein.

166.   This claim was brought within one year after the discovery of the

untrue statements and omissions in the IPO Registration Statement and Prospectus

and within three years after CIL common stock was sold to the Class in connection

with the public offering.

167.   By reason of the misconduct alleged herein, the Individual Defendants

are jointly and severally liable with and to the same extent as CIL, MaloneBailey,

Kempisty, Rodman & Renshaw, and WestPark pursuant to Section 15 of the

Securities Act.

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, certifying

Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil

Procedure and Lead Plaintiffs' counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of Lead Plaintiffs and

the other Class members against all Defendants, jointly and severally, for all

damages sustained as a result of Defendants' wrongdoing, in an amount to be

proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs

and expenses incurred in this action, including counsel fees and expert fees;

(d)    Awarding rescissory damages; and

(e)    Awarding such other and further relief as the Court may deem

just and proper.

## **JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury.


Dated: March 16, 2012                Respectfully submitted,


                                     **THE ROSEN LAW FIRM, P.A.**

                                     _____
                                     Laurence M. Rosen, Esq. (SBN 219683)

                                     and

                                     **GOLD BENNETT CERA & SIDENER LLP**
                                     Thomas C. Bright (SBN 169713)

                                     Attorneys for Lead Plaintiffs
                                     and all Others Similarly Situated

**CERTIFICATION**

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against China Intelligent Lighting and Electronics, Inc. ("CIL"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against CIL and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in CIL securities during the class period set forth in the complaint. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 75,000 | 6/18/2010 | $3.0 | | $ |
| | | $ | | $ |
| -2,000 | | $ | 25/6/2010 | $ 2.98 |
| -2,000 | | $ | 25/6/2010 | $ 3.19 |
| -855 | | $ | 25/6/2010 | $ 3.05 |
| -200 | | $ | 25/6/2010 | $ 3.04 |
| -945 | | $ | 25/6/2010 | $ 3.01 |
| -2,000 | | $ | 28/6/2010 | $ 2.90 |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __13__ day of March 2012.

ACERCO SA

Signature: _____
By:    Antoine de Sejournet
Title: Administrateur

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

## CERTIFICATE OF PLAINTIFF

I, Michael J. Corbett, on behalf of Perritt Emerging Opportunities Fund, hereby certify that:

1.    I am the President, Chief Investment Officer and Portfolio Manager of Perritt Emerging Opportunities Fund ("Perritt Fund"). I am familiar with the matters set forth herein and am duly authorized to make this Certification on behalf of the Perritt Fund.

2.    I have reviewed a complaint prepared by the Perritt Fund's attorneys, Gold Bennett Cera & Sidener LLP, and the Perritt Fund agrees to be a representative plaintiff in this action.

3.    The Perritt Fund did not purchase China Intelligent Lighting and Electronics, Inc. ("China Lighting") securities that are the subject of the complaint at the direction of counsel or to participate in any private action arising under the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. The Perritt Fund invested in China Lighting securities solely for its own business purposes.

4.    The Perritt Fund is willing to serve as representative parties on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.    I have reviewed the records of the Perritt Fund's transactions in China Lighting securities. The Perritt Fund purchased and/or sold China Lighting securities in the amounts and on the dates identified in the attachment hereto.

### [SEE ATTACHED SCHEDULE]

6.    In the three years preceding the date of this certificate, the Perritt Fund has not

#123977

-1-

sought to serve as a representative party on behalf of a class in an action brought under the
federal securities laws.

7.    The Perritt Fund will not accept any payment for serving as a representative party
on behalf of the Class beyond their pro rata share of any recovery, except such reasonable costs
and expenses directly relating to the representation of the Class and the Perritt Fund's activities
in the lawsuit, as ordered or approved by the Court.

8.    Nothing herein shall be construed to be or constitute a waiver of the Perritt Fund's
attorney-client privilege.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on May
25, 2011.

Michael J. Corbett
President, Chief Investment Officer and Portfolio Manager
Perritt Emerging Opportunities Fund

#123977

-2-

**CHINA INTELLIGENT LIGHTING  AND ELECTRONICS, INC.**
**PERRITT EMERGING OPPORTUNITIES FUND**

| Date | Symbol | Desc. | Shares | Price Per Share | Amount |
|------|--------|-------|--------|-----------------|--------|
| 06/23/10 | CIL | Buy | 300,000 | 3.0000 | $ 900,000.00 |
| 11/12/10 | CIL | Sell | 5,700 | 3.5270 | $20,104.12 |

**TOTAL SHARES PURCHASED DURING CLASS PERIOD**  300,000

**TOTAL PURCHASE PRICE DURING CLASS PERIOD**  $ 900,000.00

**TOTAL SHARES SOLD**  5,700

**NET SHARES PURCHASED DURING THE CLASS PERIOD**  294,300

**TOTAL RECEIVED FROM SALES**  $20,104.12

**NET FUNDS EXPENDED DURING CLASS PERIOD**  $ 879,895.88

**THE APPROXIMATE LOSS**  $879,895.88

**CERTIFICATION**

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against China Intelligent Lighting and Electronics, Inc. ("CIL"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against CIL and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in CIL securities during the class period set forth in the complaint.  I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number        of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 150,000 | 6/10/2010 | $3.0 | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _22_ day of _____, 2011.

                              UNIVERSAL INVEST QUALITY SICAV

Signature: _____

By:    Antoine de Sejournet
Title: _____
Address:

**REDACTED**

Phone:
E-mail:


Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827                2
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against China Intelligent Lighting and Electronics, Inc. ("CIL"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against CIL and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in CIL securities during the class period set forth in the complaint.  I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 75.000 | 6/10/2010 | $3.0 | | $ |
| | | $ | 2000 25/6/10 | $ 2.98 |
| | | $ | 2000 25/6/10 | $ 3.19 |
| | | $ | 855 25/6/10 | $ 3.05 |
| | | $ | 200 25/6/10 | $ 3.04 |
| | | $ | 945 25/6/1 | $ 3.01 |
| | | $ | 2000 28/6/10 | $ 2,90 |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):


6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __27___ day of __may_____, 2011.

ACERCO SA

Signature: _____

By:    Antoine de Sejournet
Title:  Administrateur
Address:

**REDACTED**

Phone:
E-mail:


Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827      2
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against China Intelligent Lighting and Electronics, Inc. ("CIL"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against CIL and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in CIL securities during the class period set forth in the complaint. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number       of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 25.000 | 6/10/2010 | $3.0 | | $ |
| -402 | | $ | 13/8/2010 | $ 3.49 |
| -9598 | | $ | 8/11/2010 | $ 3.4855 |
| | | $ | | |
| | | $ | | |
| | | $ | | |
| | | $ | | |
| | | $ | | |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___27___ day of __may_____, 2011.

Signature:
By:    Antoine de Sejournet
Title:
Address:
REDACTED
Phone:
E-mail:

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827    2
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against China Intelligent Lighting and Electronics, Inc. ("CIL"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed the complaint against CIL and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.     I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.     I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.     The following is a list of all of the purchases and sales I have made in CIL securities during the class period set forth in the complaint.  I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 25,000 | 6/18/2010 | $3.0 | | $ |
| -402 | | $ | 13/8/2010 | $ 3.49 |
| -9,598 | | $ | 8/11/2010 | $ 3.4855 |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __13__ day of March, 2012.

Signature: _____
By:    Antoine de Séjournet

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827    2
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

## PROOF OF SERVICE

I, Leonid Prilutskiy, pursuant to 28 U.S.C. § 1746, hereby declare under

penalty of perjury as follows:

I am an employee of the Rosen Law Firm, P.A. I am over the age of
eighteen. On March 16, 2012, I served the following **FIRST AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE SECURITIES LAWS** by U.S. mail to counsel of record for defendants at
the addresses listed below:

Timothy A Horton
McKenna Long and Aldridge LLP
750 B Street, Suite 3300
San Diego, CA 92101

Counsel for defendant China Intelligent Lighting and Electronics, Inc.

Jay S Auslander
Natalie Shkolnik
Julie Cilia
Joseph Zelmanovitz
Wilk Auslander LLP
675 Third Avenue 9th Floor
New York, NY 10017

Counsel for defendants Westpark Capital, Inc. and Rodman & Renshaw, LLC

Matthew Clark Bures
Dongell Lawrence Finney LLP
707 Wilshire Boulevard 45th Floor
Los Angeles, CA 90017

Counsel for defendants Westpark Capital, Inc., Rodman & Renshaw, LLC, Richard
Rappaport, and Anthony C. Pintsopoulos

Michael J Niborski
Bryan T Mohler
Lisa M Buckley
Pryor Cashman LLP

1801 Century Park East 24th Floor
Los Angeles, CA 90067

Jennifer J Moon
Patrick Michael Kelly
Wilson Elser Moskowitz Edelman & Dicker
555 South Flower Street Suite 2900

Counsel for defendant Kempisty & Company, Inc.

Elizabeth Graham Minerd
Reed Smith LLP
355 South Grand Avenue Suite 2900
Los Angeles, CA 90071

James C McMillin
John D Stiner
McAfee & Taft PC
211 North Robinson 10th Floor
Oklahoma City, OK 73102

Counsel for defendant Kempisty & Company, P.C.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 16, 2012, in New York, New York.

Leonid Prilutskiy